# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Matthew C. Boc, being sworn, state:

## Introduction and Agent Background

1.        I have been a Special Agent with the United States Drug Enforcement Administration ("DEA") since October of 2011. I have been assigned to the Southern New Hampshire Drug Enforcement Administration's High Intensity Drug Trafficking Area Task Force of the Boston Division of the United States Drug Enforcement Administration as a Special Agent since February of 2018. Prior to joining the DEA I was a full time Police Officer in the State of New Hampshire for approximately nine years. My current duties and responsibilities include the investigation of possible violations of federal law, including violations of 21 U.S.C. § 841(a)(1).

2.        Since joining the DEA, I have participated in twelve wiretap investigations and several other investigations where I analyzed telephone toll records and subscriber information. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search, seizure, and arrest warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts.

3.  I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the mobile phone assigned call number 978-885-3824 ("Target Mobile Phone Number 1") and the mobile phone assigned call number 617-959-2403 ("Target Mobile Phone Number 2"). The Target Mobile Phones are further described in Attachment A, and the location information to be seized is further described in Attachment B.

4.  Based on the facts set forth in this affidavit, there is probable cause to believe that Paloma TAVERAS and Mark FIELD and others have violated 21 U.S.C. §§ 841(a)(1) & 846 – Possession with Intent to Distribute and Conspiracy to Distribute Controlled Substances. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these crimes and will lead to the identification and location of those who committed them.

5.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**Probable Cause**

6.  Since approximately November of 2018, the DEA has been involved in an investigation of a DTO engaged in the distribution of fentanyl in the Lawrence, Massachusetts area (the "TAVERAS DTO"). On April 10, 2019, law enforcement conducted an undercover purchase of narcotics from the TAVERAS DTO. Utilizing a cooperating source ("CS #1")[1], law

---

[1] CS #1 has been convicted of Theft by Unauthorized Taking (2018), Stalking (2018), Simple Assault (2017), Obstructing Government Administration (2017), Stalking (2017), Act Prohibited (2016), Reckless Conduct with a Deadly Weapon (2015), Conduct after an Accident (2015), Disobeying an Officer (2015), Conduct After an Accident (2013), Operating While Being Certified as a Habitual Offender (2014), and Stalking (2013). I am aware

enforcement placed a call to telephone number 857-▢▢▢-033, which was known to be used by the TAVERAS DTO to arrange the drug transactions with its customer base. An unidentified female ("UF1") answered the phone and CS #1 stated that it needed to purchase 17 grams of fentanyl. UF1 told CS #1 that it could come down and that it should text her when it gets closer for a pickup location. A short while later, CS #1 received a text message from 857-▢▢▢-3033 that directed it to ▢▢ Portland Street, Lawrence, MA. Under the supervision of law enforcement, CS #1 and an Undercover Officer ("UC") traveled to ▢▢ Portland Street and waited for the drug runner. Approximately five minutes later, law enforcement conducting surveillance observed a Hispanic male ("HM1") walk from the area of Market Street and approach the UC and CS #1. HM1 walked to the passenger's side of the vehicle and entered the rear passenger seat. The UC and CS #1 conducted the purchase of 17 grams of suspected fentanyl with HM1 in exchange for $500. After the deal was completed, HM1 exited the vehicle and walked back in the direction he had come from and left the area.

7. On May 15, 2019, CS #1 advised that it had received a text explaining that the customer phone number that the DTO used had changed to 857-▢▢▢-9271 and to use that number in the future. On May 30, 2019, CS #1 placed a call to 857-▢▢▢-9271. An unidentified female, believed to be UF1, answered the phone and CS #1 stated that it needed to purchase 20 grams of fentanyl. UF1 told CS #1 that it could come down and that it should text her when it gets closer for a pickup location.

---

that CS #1 was a drug user and distributor but on the one occasion I met with it, it told me that it was not currently using drugs. CS #1 stated that it is in a drug treatment program. CS #1 is cooperating with law enforcement with the hope of receiving financial compensation. The information provided by CS #1 has been independently corroborated and I believe it to be reliable.

8. A short time later, CS #1 received a text message from 857- 9271 that directed it to Farnham Street, Lawrence. Under the supervision of law enforcement, CS #1 and a UC traveled to Farnham Street and waited for the drug runner. Approximately five minutes later, law enforcement conducting surveillance observed a Hispanic male ("HM2") walk from the area of Farnham Street and approach the UC and CS #1. HM2 walked to the passenger's side of the vehicle and entered the rear passenger seat. The UC and CS #1 conducted the purchase of 20 grams of suspected fentanyl with HM2 in exchange for $570. After the deal was completed, HM2 exited the vehicle and walked back in the direction he had come from. Law enforcement followed HM2 back to Farnham Street.

9. Law enforcement continued to conduct surveillance in the area of Farnham Street and observed HM2 exit the house. HM2 walked directly to a waiting Honda Ridgeline driven by a white male and got into the passenger's seat. HM2 appeared to pass something to the driver and then exited the vehicle after approximately one minute, then returned back to the residence. The driver of the Ridgeline then departed.

10. Approximately thirty minutes after the undercover drug purchase, Lawrence Liberty Cab #130 arrived in front of the residence and honked its horn. A short time later, a young Hispanic male ("HM3") exited Farnham Street carrying a backpack and entered the waiting cab. Approximately one minute later, HM2 exited Farnham Street, also carrying a backpack, and entered the cab. The cab departed and was followed by law enforcement until it reached its destination at Floral Street, Lawrence.

11. Law enforcement continued to observe HM2 and HM3 as they sat on a park bench directly south of Floral Street. Both HM2 and HM3 appeared to be looking over their shoulders in what appeared to be an attempt at counter-surveillance. HM3 was also seen

operating two different phones while sitting on the bench. One smart phone and one flip style phone. After a short time, both HM2 and HM3 walked to an abandoned house at ▇ Floral Street and sat on an external staircase. After approximately thirty minutes, a New Hampshire registered vehicle pulled over in the area of ▇ Floral Street. Law enforcement watched HM2 walk from the rear of the residence, and begin looking around while using a phone. After a few minutes of conducting apparent counter-surveillance, HM2 walked over to the New Hampshire plated vehicle and leaned in the window. After approximately one minute, the vehicle departed and HM2 returned to the staircase where HM3 was still sitting.

12. After approximately 15 minutes, law enforcement approached HM2 and HM3 at the abandoned house. Both HM2 and HM3 attempted to run from law enforcement around the rear of the house. Officers observed HM3 attempt to hide currency under a log in the rear of ▇ Floral Street. Both HM2 and HM3 were apprehended after a short pursuit. Law enforcement recovered currency from under the log, a silver flip phone and approximately 17 individually wrapped gram packages of suspected fentanyl, all within ten feet of where HM2 and HM3 were apprehended.

13. The recovered currency included bills matching the serial numbers used to conduct the undercover purchase earlier in the day. The suspected fentanyl baggies that were recovered in the rear of ▇ Floral Street also matched the suspected drugs which were purchased earlier in the day. HM3 was also found in possession of a Samsung smartphone which is now identified as the "Device."

14. Law enforcement identified HM2 as ▇ LUGO and HM3 as ▇ DELACRUZ. Both DELACRUZ and LUGO were discovered to be fifteen years of age. Law enforcement conducted a debrief of both DELACRUZ and LUGO regarding the drug trafficking

activities. LUGO stated that he had been working for a DTO for approximately six months and that he sold fentanyl with DELACRUZ. LUGO said that DELACRUZ was his boss and that they would receive drugs from a Hispanic female ("HF1") every morning via a taxi cab. HF1 would meet them and give them a package of small, usually bagged, amounts of drugs. DELACRUZ and LUGO would then travel to a predetermined location to meet the customers, which were sent to them by HF1. LUGO and DELACRUZ stated that they were just "runners" and that they didn't know the name of HF1. LUGO said that DELACRUZ communicated to HF1 through his grey Samsung phone and that DELACRUZ would receive the customer orders from HF1 and DELACRUZ would tell HF1 where they were set up to deal. LUGO said that HF1 was listed in DELACRUZ's phone contacts as "KLK" and "KLK1." LUGO said that once DELACRUZ knew the amount to be sold, he would give the drugs to LUGO who would then meet the customers and take the money. LUGO said that DELAZCRUZ had a silver flip phone which he used to talk to customers directly if needed.

15. During his debrief with law enforcement, DELACRUZ provided a similar description of the operation of the DTO as was given by LUGO. DELACRUZ stated that he works for a DTO that sells fentanyl and described the person who provides him with the drugs to sell as a female, light skin, tall and skinny. DELACRUZ stated that he gets a bag, usually containing 20 smaller baggies of fentanyl in it. DELACRUZ stated he gets paid $80 per day and once he finishes selling the bag of fentanyl, he will call HF1 who will retrieve the proceeds. DELACRUZ stated that HF1 usually arrives in a taxi cab to collect the money.

16. DELACRUZ was observed by law enforcement frequently utilizing the Device during suspected drug transactions carried out by LUGO. The Device was searched pursuant to a search warrant issued by this Court. An examination of the cell phone data that was extracted

from the Device showed that "KLK" is assigned to 617-959-2403 in the contacts, corresponding to Target Mobile Phone Number 2. There are three phone calls listed for KLK. Two of the calls were incoming calls on May 29, 2019. One call was made at 6:19 P.M and lasted 14 seconds. The second call was at 10:04 P.M. and lasted 19 seconds. There was one incoming call on May 30, 2019 at 12:42 P.M. but it was a missed call because the phone had been seized by agents at that time. "KLK1" was assigned to 978-885-3824 in the contacts, corresponding to Target Mobile Phone Number 1. There are numerous phone calls and texts listed for KLK1. On May 30, 2019, there are numerous calls and texts around the time of the undercover buy. There was an incoming call at 11:12 A.M. that lasted 29 seconds. There was another incoming call at 11:15 A.M. that lasted 8 seconds. The deal with the undercover took place at approximately 11:17 A.M. and there is an outgoing call at 11:21 A.M., shortly after the deal was done and law enforcement observed the target exit the UC vehicle. The phone then received several unanswered calls after DELACRUZ and LUGO were in custody.

17.     There is therefore probable cause to believe that Target Phone Number 1 and Target Phone Number 2 are being used to coordinate and conduct narcotics transactions. Real-time location data from the phones will assist law enforcement in locating and identifying targets and the locations utilized by the TAVERAS DTO to conduct business.

**The Relevant Technology**

18.     I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile

phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

## Authorization Request

19.  I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.[2]

20.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Mobile Phone on T-Mobile's network, and at such intervals and times as directed by the government. The government will compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

21.  I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the

---

[2] 18 U.S.C. 2703(c) authorizes a "court of competent jurisdiction" to issue a search warrant for the kinds of records that this application seeks. A "court of competent jurisdiction" includes a district court ("including a magistrate judge") that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b) T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. See 18 U.S.C. § 2705(b).

      22.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay any required notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of Target Phone Number 1 and Target Phone Number 2 would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of

any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

23.  I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Mobile Phone outside of daytime hours.

24.  I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court, except that the government may produce them in criminal discovery and provide the search warrant to T-Mobile. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

/s/ Matthew Boc
Special Agent Matthew Boc
U.S. Drug Enforcement Administration

Subscribed and sworn to before me on 7/19/2019

   /s/ Andrea K. Johnstone
Hon. Andrea K. Johnstone
United States Magistrate Judge

**ATTACHMENT A**

Information about the location of:

(1)     the mobile phone assigned call number 978-885-3824 ("Target Mobile Phone Number 1"), the subscriber to which is Paloma TAVERAS, ▮▮▮▮▮▮▮▮▮▮ Lawrence, Massachusetts, 01841, United States, and that is believed to belong to Paloma TAVERAS. The service provider for this phone is T-Mobile, a wireless telephone service provider that accepts service of process at 4 Sylvan Way, Parsippany, NJ 07054

(2)     the mobile phone assigned call number 617-959-2403 ("Target Mobile Phone Number 2"), the subscriber to which is Mark FIELD with no listed subscriber address. The service provider for this phone is also T-Mobile.

## ATTACHMENT B

All information about the location of the Target Mobile Phones described in Attachment A for a period of thirty days from the date of service of this warrant, during all times of day and night, including:

1. E-911 Phase II data;
2. GPS data;
3. latitude-longitude data;
4. other precise location information; and
5. data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Mobile Phone.

This warrant does not authorize the collection of any content of any communications.

T-Mobile ("T-Mobile") must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the Target Mobile Phone unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Mobile Phone on T-Mobile's network, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

T-Mobile shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b). *See* 18 U.S.C. § 2705(b). T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.